[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTIONS TO DISMISS OF DEFENDANT FORAGE RESEARCH. INC. FOR LACK OF PERSONAL JURISDICTION
The plaintiffs, David and Marie Goldstein of Westport, Connecticut, originally brought this products liability/loss of consortium action by a complaint dated January 31, 1996. In their CT Page 11068 original complaint, the plaintiffs alleged that in October of 1993, David Goldstein sustained certain serious physical injuries when he ingested a nutritional supplement known as PB 8, and that as a result of those injuries, he and his wife, Marie Goldstein, suffered several additional injuries and losses. Named as defendants in the original complaint were Nutrition Now, Inc. ("Nutrition Now"), a Delaware corporation with its principal place of business in Vancouver, Washington, American Type Culture Collection, Inc., a Washington, D.C. corporation with its principal place of business in Rockville, Maryland, and Food For Thought Natural Foods Market, Inc. ("Food For Thought"), a Connecticut corporation with its principal place of business in Westport, Connecticut. The plaintiffs alleged, inter alia: that Nutrition Now designed, prepared, assembled, tested, packaged, labeled, advertised, marketed and sold the PB 8 capsules that injured Mr. Goldstein; that American Type Culture Collection designed, prepared, assembled, tested, packaged, labeled, advertised, marketed and sold certain bacterial cultures that were used by Nutrition Now as component parts of its PB 8 product; and that Food For Thought made the final retail sale of the particular PB 8 capsules that injured Mr. Goldstein.
Thereafter, Food For Thought filed a so-called "apportionment complaint," under the purported authority of Public Act 95-111 and General Statutes § 52-5720, against several additional "apportionment defendants," all of which had allegedly participated or sold and supplied ingredients used in the manufacture of PB 8. The new defendants were Cappseals, Inc., a Washington corporation with its sole place of business in Vancouver, Washington. which allegedly put the ingredients for PB 8 into capsules and packaged the capsules in sealed containers for retail sale, Forage Research, Inc. d/b/a Star Labs. Inc. ("Forage Research"),[1] a Missouri corporation with its principal place of business in Clarksdale, Missouri, which allegedly sold a bacterial product known as ProBiotic Supplement that was used as a component of PB 8, and Stauber Chemical, Inc. ("Stauber"),[2] a California corporation with its principal place of business in Brea, California, which allegedly sold certain other bacterial products that were also used as components of PB 8.
The plaintiffs then pled over against the apportionment defendants, bringing direct claims for damages against each of them by an Amended Complaint dated August 27, 1997. Thereafter, Stauber filed a third-party complaint against Test Labs, Inc. CT Page 11069 d/b/a Brewster Foods ("Brewster Foods" or "Brewster"). a California corporation with its principal place of business in Reseda, California, claiming that Brewster had supplied the PB 8 components it had sold to Nutrition Now. Nutrition Now then followed Stauber's lead by filing a cross-claim, based on similar allegations, against Brewster Foods. Brewster Foods then filed a fourth-party complaint against Wellington Foods, Inc. ("Wellington"), a California corporation with its principal place of business in Long Beach, California, claiming that Wellington had been the source of the product it had supplied to Nutrition Now. Finally, Stauber amended its third-party complaint against Brewster to add its own separate claim against Wellington based on the allegations of Brewster's fourth-party complaint.
The case is now before the Court for decision on motions to dismiss for lack of personal jurisdiction filed by defendant Forage Research.[3]
 I. GENERAL PRINCIPLES
In order to assert personal jurisdiction over a foreign corporation, a court must determine that two conditions are met. First, there must be a jurisdictional statute that reaches the conduct of the defendant. Fuchrer v. Owens-Corning FiberglassCorp., 673 F. Sup. 1150, 1153 (D.Conn. 1986). Second, even where a statute purports to grant jurisdiction. the exercise of that jurisdiction under the circumstances presented must not exceed constitutional due process limitations, which require that the defendant have "minimum contacts" with the state sufficient that it would reasonably anticipate being haled into court there. Id.
at 1153.
When a motion to dismiss for lack of personal jurisdiction raises a factual question that cannot be decided on the face of the record, the burden of proof is on the plaintiffs to present evidence which will establish jurisdiction. Standard Tallow Corp.v. Jowdy, 190 Conn. 48, 54. 459 A.2d 503 (1983). To meet this burden, the plaintiffs must do more than merely rely on conclusory allegations in their complaint. Instead, they must make at least a prima facie showing of jurisdiction through their own affidavits or supporting materials. Fuchrer v. Owens-CorningFiberglass Corp. , supra, 673 F. Supp. at 1153. A decision to grant a motion to dismiss may appropriately be based upon uncontroverted affidavits or materials from the party seeking dismissal. Id.
CT Page 11070
 II. JURISDICTION UNDER THE STATE LONG-ARM STATUTE
In Connecticut, jurisdiction over a foreign corporation must be predicated upon General Statutes § 33-929, which provides in part as follows:
 (f) Every foreign corporation shall be subject to suit in this state, by a resident of this state or by a person having a usual place of business in this state, whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows: . . . (2) out of any business solicited in this state by mail or otherwise if the corporation has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the state (3) out of the production, manufacture or distribution of goods by such corporation with the reasonable expectation that such goods are to be used or consumed in this state and are so used or consumed, regardless of how or where the goods were produced, manufactured, marketed or sold or whether or not through the medium of independent contractors or dealers[.]
To meet its burden of proving that this Court has statutory jurisdiction over Forage Research, the plaintiffs have attempted to show that Forage Research's challenged actions bring it within the scope of Section 33-929 (f)(2) and/or (f)(3).
 A. Alleged Repeated Solicitation of Business in Connecticut
To establish jurisdiction over an out-of-state corporation under Section 33-929 (f)(2), the plaintiffs must prove both that their "cause of action aris[es] . . . out of any business solicited in this state by mail or otherwise" and that "the [defendant] corporation has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the state." In Thomason v. Chemical Bank,234 Conn. 281, 295-96, 661 A.2d 595 (1995), the Connecticut Supreme Court discussed the first of these requirements as follows, as it then was set forth in the predecessor of the current subsection, General Statutes § 33-411(c)(2)[4]:
 For purposes of § 33-411 (c)(2), a plaintiffs "cause CT Page 11071 of action aris[es] . . . out of . . . business solicited in this state" if, at the time the defendant engaged in solicitation in Connecticut, it was reasonably foreseeable that, as a result of that solicitation, the defendant could be sued in Connecticut by a solicited person on a cause of action similar to that now being brought by the plaintiffs.
 Pursuant to our interpretation of the statute, a plaintiff need not show that, because of the acts of solicitation, the defendant was on notice that it might be sued by the plaintiff himself or herself. A plaintiff similarly need not show that the defendant solicited his or her business in Connecticut. A plaintiff need only demonstrate that the defendant could reasonably have anticipated being haled into court here by some person who had been solicited in Connecticut and that the plaintiffs cause of action is not materially different from an action that might have resulted directly from that solicitation.
 This interpretation of the statute is consistent with both of the principles we have discussed. On the one hand, because the statute does not demand proof that a particular plaintiffs business was solicited in Connecticut, the statute does not require proof of a "causal connection" between the solicitation and the plaintiffs injuries. On the other hand, because the statute does demand proof that a particular plaintiffs cause of action is similar to a cause of action that could have been brought here by a person whose business the defendant did solicit, the statute is more restrictive than the federal constitutional test for general jurisdiction, under which this state could have elected to exercise jurisdiction over causes of action wholly unrelated to the defendant's conduct in this forum.
The plaintiffs do not claim that this Court has personal jurisdiction over defendant Forage Research because the instant case arose from or relates to any business solicited by the defendant in the State of Connecticut. Instead, it claims, underThomason, that the defendant is subject to this Court's jurisdiction under Section 33-929 (f)(2) because for many years it regularly advertised a number of its products in several trade magazines and journals, some of which it knew to have a nationwide circulation, and all of which were regularly circulated to subscribers in Connecticut. The plaintiffs have supported this claim with evidence from two principal sources. CT Page 11072 First, they have presented the February 12, 1998 deposition of Forage Research's Director of Marketing, Gary Jones, who named and described the target audiences of several journals and magazines in which Forage Research published advertising over the preceding fifteen years, gave the approximate time periods in which it published such advertising, and identified several specific advertisements which it placed during those time periods. Second, they presented affidavits from the representatives of companies that published some of those magazines and journals, who provided information as to the publication schedules and Connecticut circulations of their respective publications between 1992 and 1996. From their combined evidence, the following facts have been established.
Throughout the 1980's and 1990's, Forage Research marketed its microbial animal feed products to animal feed producers and poultry and livestock farmers throughout the United States. Claiming that the value of its products in preserving or enhancing the nutritional value of standard animal feeds had been convincingly proved in scientific trials and tests, Forage Research published several detailed advertisements designed to persuade potential customers of the validity of those test results, and thus of the benefits to be gained by using its products to preserve, enhance or supplement their poultry and livestock feeds.
Such advertisements appeared in several publications known by Forage Research to reach potential customers throughout the United States, including: Feedstuffs, a weekly trade newspaper published by the Miller Publishing Company of Minnetonka, Minnesota, in which Forage Research has advertised PrimaLac, one of its principal microbial products for poultry and livestock, for over fifteen years, reaching at least 58 Connecticut subscribers per year in 1992 and 1993; Feed Management, a monthly magazine published by the Watt Publishing Company of Mt. Morris, Illinois, in which Forage Research has advertised PrimaLac and other microbial products used in the feeding of poultry, pigs, horses and calves for at least ten years, also reaching 58 Connecticut subscribers per year in 1992 and 1993; and Hoard'sDairyman, published twenty (20) times per year by the W.D. Hoard Sons Company of Fort Atkinson, Wisconsin, in which Forage Research advertised Sila-Prime, a product designed for use on corn silage and high moisture grain, for over fifteen years, reaching from 551-676 Connecticut subscribers per year between 1992 and 1996. They were also regularly published in several CT Page 11073 other periodicals whose breadth of circulation was allegedly unknown to Forage Research, including: a monthly publication from Intertec Publishing of Overland Park, Kansas, in which Forage Research advertised Sila-Prime for over ten (10) years, reaching at least 35 Connecticut subscribers per year in 1992 and 1993;Hay Forage Grower, also published by Intertec Publishing of Overland Park, Kansas, eight (8) times per year until 1992 and four (4) times per year thereafter, in which Forage Research advertised Sila-Prime for at least seven (7) years, reaching from 86-105 Connecticut subscribers per year between 1992 and 1996; and Dairy Herd Management, a monthly magazine published by Vance Publishing of Overland Park, Kansas, in which Forage Research advertised Sila-Prime for over ten (10) years, reaching from 470-517 Connecticut subscribers per year between 1992 and 1996. In addition, they were regularly placed in several other publications for which no Connecticut circulation data have been provided, including: Feed International, Poultry Times, and Who'sWho in the Poultry Industry.
On the basis of this evidence, the plaintiffs claim that the defendant has repeatedly solicited business in Connecticut for over a decade, and thus that it could reasonably have anticipated being haled into court here by some person whose business was solicited in Connecticut as a result of that advertising. They therefore conclude, under Thomason, that since their pending cause of action is not materially different from one that might have resulted directly from such a solicitation, the jurisdictional requirements of Section 33-929 (f)(2) have been satisfied.
The defendant naturally disagrees with the plaintiffs' analysis, insisting that the mere publication of advertising in a national trade publication "does not automatically provide personal jurisdiction under the Connecticut Long Arm Statute." Defendant's Reply Memorandum (2/10/99), p. 2. Because such advertising is not particularly directed to Connecticut, as opposed to other jurisdictions, it allegedly fails to put the advertiser on reasonable notice that it might be haled into a Connecticut court to defend a lawsuit brought by one whose business was thereby solicited in this state.
In deciding the parallel motions to dismiss of defendant Stauber, this Court distinguished, "for the purpose of establishing the repeated solicitation requirement of the Connecticut long-arm statute, between frequent, geographically CT Page 11074 focused advertising that specially targets Connecticut customers,[which tends to support a finding of jurisdiction] . . . and less frequent, more general advertising that lacks a particular Connecticut focus[, which does not]." Memorandum of Decision on Defendant Stauber's Motions to Dismiss, p. 9. Applying that distinction to the evidence before it on Stauber's motions, the Court concluded as follows that Stauber's publication of three brief, non-specific, informational listings in consecutive annual editions of a national chemical buyers directory did not bring it within this Court's long-arm jurisdiction under Section 33-929 (f)(2):
 The listings in question, if advertisements at all, were general and informational in nature. By their very design, they were not intended to lead directly to the placement or product orders. Their publication, moreover, though in an annual directory which most subscribers probably retained for at least one year to use as a reference, was certainly not frequent. Finally and most importantly, the listings were not geographically focused on Connecticut, for they did not appear in the local media and nothing in them — including the products they generically listed, the persons from whom or the places where those products could be ordered, or the means by which such orders could be placed or processed — was geared particularly to Connecticut consumers or the Connecticut market. Under these circumstances, defendant Stauber cannot reasonably be found, simply by publishing its three annual listings in the O.P.D. Directory, to have repeatedly solicited business in Connecticut, or thus to "have anticipated being haled into this court by some person who had been solicited in Connecticut by one of th[o]se [listings]." Wylie v. Sapphire Beach Resort and Marina, [Superior Court, Judicial District of Litchfield, Docket No. CV 95 0067304 5 (August 4, 1995, Pickett, J., 15 Conn.L.Rptr. 188)].
Memorandum of Decision on Defendant Stauber's Motions to Dismiss, p. 10.
Based on the evidence presented on the instant motions, this Court cannot find that Forage Research's advertising was specially focused on Connecticut, to the exclusion of other potential markets. It did not appear in the local media, and nothing in it was geared particularly to Connecticut consumers or the Connecticut market. Unlike Stauber's advertising, however, Forage Research's Connecticut advertising was published very CT Page 11075 often, for many years, in frequently issued magazines and journals, it was very detailed and product-specific in its content, and, in sum, it was clearly intended to lead directly to the placement of product orders wherever it was read. For the following reasons, the Court concludes that such advertising constituted the repeated solicitation of business in Connecticut, and thus satisfied the jurisdictional requirements of Section33-929 (f)(2).
The plaintiffs have established that Forage Research has been an active player in the national market for animal feed products for over fifteen years. During that time, it has aggressively advertised its microbial products throughout the country, touting their effectiveness in specialized magazines and journaLs designed reach those particular persons and businesses in every state, including Connecticut, who were most likely to understand and appreciate the advantages of its products, and thus to order them for themselves or their customers. Though the absolute number of Connecticut subscribers to such specialized magazine or journal has never been large, the penetration of such magazines and journals into relevant segments of the state's shrinking farming community has doubtless been substantial. For products with such a narrow, specialized market, which cannot profitably be advertised in this part of the country in general circulation newspapers or periodicals, persistent weekly or monthly advertising in such targeted, specialized publications was surely one of the most effective means of marketing available.
Such advertisements, moreover, were more than merely informational announcements about the general nature of Forage Research's business activities. Cf. Lombard Brothers. Inc. v.General Asset Management Co., 190 Conn. 245, 257-58, 460 A.2d 481
(1983) (where the Court held that a New York securities dealer could not lawfully be sued in Connecticut merely because it had published certain informational advertising about its business operations and activities in certain publications widely circulated in this state). Instead, they were focused advertisements, designed to persuade knowledgeable readers as to the benefits of particular products, and on that basis to generate new orders from them for such products. A typical advertisement thus not only listed the name and general uses of the product in question, but identified the product's special microbial ingredients, gave a detailed description of the claimed benefits of those ingredients, and urged readers with further questions to call, write or fax them to the defendant's place of CT Page 11076 business in St. Joseph, Missouri. In addition, for those who doubted the defendant's claim that the products' effectiveness had been scientifically proven, it promised to provide "copies of university trials" to all who requested them.
It is true, of course, that only some of the advertisements in question quoted specific prices for the products they described and promoted. It is also true that none of them identified local sales agents or customer representatives through whom would-be customers could place orders for those products, or gave a "1-800 number" or an e-mail address by which out-of-state customers could convemently place such orders. However, they invariably bade potential customers to "see your dealer" to obtain the products, thereby suggesting that they already were available or could easily be made available for local sale or delivery. In sum, the advertisements' lack of a particular Connecticut focus does not undermine the conclusion that they were purposefully designed to solicit business in Connecticut.
In conclusion, this Court finds that by regularly placing focused, product-specific advertisements in several specialized periodical publications, many known to be national in scope and circulation, for many years, defendant Forage Research repeatedly solicited business from poultry and livestock feed consumers and suppliers in every State, including Connecticut. It was thereby put on reasonable notice that it might be haled into a Connecticut court to defend a product liability action brought by any person injured by its products whose business was so solicited. Because this action is not materially different from one that might have been brought by a person whose business was solicited in Connecticut, this Court may properly exercise personal jurisdiction over the defendant under Section 33-929
(f)(2).
 B. Alleged Production, Manufacture or Distribution of Goods With the Reasonable Expectation That They Were to Be Used or Consumed In This State and They Were So Used or Consumed
To establish jurisdiction over an out-of-state corporation under Section 33-929 (f)(3), the plaintiffs must prove both that their "cause of action aris[es] . . . out of the production, manufacture or distribution of goods by such corporation with the reasonable expectation that such goods are to be used or consumed in this state" and that goods so produced, manufactured or distributed were actually "used or consumed [here], regardless of CT Page 11077 how or where they were produced, manufactured, marketed or sold or whether or not through the medium of independent contractors or dealers[.]" The parties agree that here, as in a claim of jurisdiction based on the alleged repeated solicitation of business under Section 33-929 (f)(2), "the phrase "arising out of in [Section 33-929 (01 . . . does not require a causal connection between the defendant's forum directed activities and the plaintiffs' lawsuit." Thomason v. Chemical Bank, supra,234 Conn. at 295. Instead, to paraphrase the Thomason Court's holding under Section 33-929 (f)(2), and thereby adapt it the instant claim under Section 33-929 (f)(3), a plaintiffs "cause of action aris[es] . . . out of [the defendant's] production, manufacture or distribution of goods . . . with the reasonable expectation that such goods are to be used or consumed in this state," if
 at the time the defendant engaged in such [production, manufacture or distribution of goods] . . ., it was reasonably foreseeable that, as a result of [such production, manufacture or distribution] . . ., the defendant could be sued in Connecticut . . . on a cause of action similar to that now being brought by the plaintiffs.
 [A] plaintiff need not show that, because of the acts of [production, manufacture or distribution of goods . . . with the reasonable expectation that such goods are to be used or consumed in this state,] the defendant was on notice that it might be sued by the plaintiff himself or herself. . . . A plaintiff need only demonstrate that the defendant could reasonably have anticipated being haled into court here by some person who had [used or consumed goods it produced, manufactured or distributed with the reasonable expectation that such goods would be used or consumed in Connecticut] . . . and that the plaintiffs cause of action is not materially different from an action that might have resulted directly from that [use or consumption].
Thomason v. Chemical Bank, supra, 234 Conn. at 296. (Emphasis in original.)
The plaintiffs present two basic arguments in support of their claim that this Court has personal jurisdiction over Forage Research under Section 33-929 (f)(3). The first is that on two separate occasions after the commencement of this action, once in December of 1997 and once in January of 1998, the defendant sold and shipped quantities of its PrimaLac Poultry product to an egg CT Page 11078 farm in Connecticut. By engaging in such conduct, claim the plaintiffs, the defendant obviously distributed its goods to this state with the reasonable expectation that such goods were to be used or consumed here, and thereby exposed itself to the jurisdiction of this Court under Section 33-929 (f)(3). The second is that on or about September 1, 1992, after lengthy negotiations in which it played an active role, the defendant entered into a so-called "Marketing Agreement" with defendant Nutrition Now, under which it granted Nutrition Now the exclusive right to market its microbial products for the human health market "throughout the United States." By entering into and performing under this agreement in exchange for Nutrition Now's guaranteed annual purchase of certain minimum quantities of its microbial products, the defendant is claimed to have manufactured and distributed its goods, including those that allegedly injured plaintiff David Goldstein, with the reasonable expectation that they would be used or consumed "throughout the United States," including in Connecticut.
The first of these arguments can be easily disposed of, for as previously noted, it is based upon alleged conduct by the defendant which postdates the commencement of this action. As this Court previously stated in ruling on the parallel motions to dismiss of defendant Stauber,
 Whether or not a court has jurisdiction over a party must logically be determined as of the moment when the party is haled into court. See, e.g., Metropolitan Life Ins. Co. v. Robertson-Ceco Corp. , 84 F.3d 560, 569 (2d Cir.), cert. denied, 117 S.Ct. 508 (1996); Green v. Sha-Na-Na, 637 F. Sup. 591, 595 (D.Conn. 1986) ("It is well established that jurisdiction is to be determined by examining the conduct of the defendants as of the time of service of the complaint"); Connecticut Aircraft Corp. v. Smith, 574 F. Sup. 626, 630 (D.Conn. 1983). Absent jurisdiction at that time, the case must be dismissed if it is seasonably challenged by a proper motion to dismiss under Practice Book § 10-310 (formerly § 142).
Memorandum of Decision on Defendant Stauber's Motions to Dismiss, pp. 10-11.
This case was brought against defendant Forage Research by the service of Food For Thought's apportionment complaint of June 21, 1996 and the Goldstein plaintiffs' Amended Complaint of August 27, 1996. Since both of its alleged sales and deliveries CT Page 11079 of products to a Connecticut consumer took place over one year later, this Court concludes that such activity can furnish no lawful basis upon which to establish this Court's jurisdiction over Forage Research under Section 33-929 (f)(3).
The plaintiffs' second argument, however, is far more convincing. It is, quite simply, that by agreeing to grant a company with a nationwide marketing organization the exclusive right to market its microbial products for the human health market "throughout the United States," then manufacturing such products and selling them to that company pursuant to the marketing agreement, the defendant manufactured and distributed goods with the reasonable expectation that they would be used or consumed all over the country, including in Connecticut.
The defendant disputes this claim based on the sworn affidavit of its President, Cliff Boyer. Mr. Boyer acknowledges that the defendant sold its human grade microbial product, known as ProBiotic Supplement, only to Nutrition Now, and that that product was sometimes used to manufacture PB 8, the nutritional supplement that allegedly injured plaintiff David Goldstein. He insists, however, that the defendant had no involvement with ProBiotic Supplement after it was shipped to Nutrition Now, no involvement with PB 8 at any point in time, and thus no awareness of the nature or extent of the markets into which products containing ProBiotic Supplement may have been sold. For that reason, and because Forage Research retained no control over or interest in the ProBiotic Supplement after its sale to Nutrition Now, Mr. Boyer asserts that Forage Research could not reasonably have expected that PB 8 or any other products containing ProBiotic Supplement would have been used or consumed in Connecticut. For the reasons that follow, this Court is persuaded that Forage Research did in fact reasonably expect that its human grade microbial products would be marketed, and thus be used or consumed, in Connecticut.
The salient provisions of Forage Research's marketing agreement with Nutrition Now were as follows:
 MARKETING AGREEMENT This agreement is entered into this 1st day of September 1992, by and between Star-Labs[,] a subsidiary of Forage Research Inc, . . . and Nutrition Now Inc[.] CT Page 11080
 WHEREAS, Star-Labs is engaged in the manufacture, production and sales of Microbial products under the Primalac tradename and trademark.
 WHEREAS, Nutrition Now Inc, maintains a marketing organization to the Human Health market throughout the United States.
 ARTICLE I. Subject to the conditions hereinafter set forth, Star-Labs hereby grants to Nutrition Now Inc. for the term of this agreement, the exclusive right to market throughout the United States the Microbial products that Star-Labs manufactures for the Human Health market.
 ARTICLE II. Both parties recognize that it will be economically feasible to them to continue their relationship under this agreement only if the sales volume so warrants. Accordingly, it is agreed that Star-Labs, may at its option cancel the agreement if Nutrition Now Inc, purchase orders do not meet the following minimums.
 1. For the 12 months following the execution of this contract, a set minimum purchase of US $75,000.00
 2. For the following second twelve months a set minimum purchase of US $100,000.00
 3. For the following third twelve months a set minimum purchase of US $125,000.00
 In the event Star-Labs terminates this agreement for non-performance, Nutrition Now Inc, shall retain the right to purchase product from Star-Labs on a non-exclusive basis, providing Star-Labs does not enter into an exclusive agreement with another marketing organization.
Marketing Agreement (appended to defendant Food For Thought's November 25, 1998 Objection to Motion to Dismiss as Exhibit I), p. 1. So drafted, the agreement clearly contemplated that Forage Research and Nutrition Now would do a significant amount of business together for a considerable period of time. During that CT Page 11081 time, the defendant would continue to manufacture its microbial products for the human health market and Nutrition Now, exercising its "exclusive right to market [them] throughout the United States," would purchase at least guaranteed minimum quantities of them to be sold through its "marketing organization to the Human Health market throughout the United States."
By entering into this agreement, Forage Research clearly sought to create a market for its human grade microbial products all across the country. It implicitly expressed such a goal in an early 1992 letter from its Director of Marketing, Gary Jones, to Nutrition Now's President, Martin Rifkin, wherein it offered Nutrition Now "the exclusive marketing rights in the United States to the human product coming from this facility" in exchange for the latter's guaranteed minimum yearly sales of that product over a three-year term. Jones Letter to Rifkin (attached to Defendant Nutrition Now's Objection to Forage Research's Motion to Dismiss dated January 5, 1999 as Exhibit A). More importantly, it was given good reason to expect that it would achieve that goal through the concerted efforts of Nutrition Now's nationwide marketing organization. Not only did such an expectation arise from the express terms of the agreement, which highlighted the nationwide marketing resources of Nutrition Now, but it was confirmed by the statements of Nutrition Now's President, Martin Rifkin, who in an August 4, 1992 letter to Forage Research's Director of Marketing, Gary Jones, promised to use "almost all" of those resources to market Forage Research's products. Mr. Rifkin's letter, which proposed certain changes in the draft agreement and confirmed Nutrition Now's commitment to making it work, provided as follows:
Dear Gary,
 Enclosed are our changes to the marketing agreement. All of our changes really reflect a desire for a long term relationship based on us hitting the purchasing requirements. We will be devoting almost all of our marketing resources towards the promotion of this great product. We feel confident that we will meet and exceed the sales minimums. The show we just attended went very well, and we picked up many new customers. If you have questions about our changes, please call me. We look forward to doing business with you.
Sincerely, CT Page 11082
 /ss/ Martin Rifkin President
Rificin Letter to Jones (8/4/92) (attached to Defendant Nutrition Now's Objection to Forage Research's Motion to Dismiss dated January 5, 1999 as Exhibit C) (Emphasis added).
Against this background, Forage Research had every reason to believe that with the signing of its marketing agreement with Nutrition Now on September 1, 1992, it was initiating an active, well supported campaign to market its ProBiotic Supplement throughout the United States. Hence, though it had no right to direct, control or influence precisely how or where Nutrition Now would conduct that campaign, it had strong reason to believe that that campaign, like the marketing resources of the company that would mount it, would not be confined to a particular region or otherwise be restricted in any way. Having contracted with a nationwide organization to market its products throughout the United States, it could not reasonably have expected anything less.
Therefore, when, after September 1, 1992, Forage Research manufactured its ProBiotic Supplement and sold and distributed it exclusively to Nutrition Now, it clearly did so with the reasonable expectation that that product would be marketed throughout the United States, and thus that it would reach and be used or consumed in the State of Connecticut. The Court therefore finds that it has personal jurisdiction over the defendant under Section 33-929 (f)(3) as well as under Section 33-929 (f)(2).
III. JURISDICTION UNDER CONSTITUTIONAL DUE PROCESS STANDARDS
Forage Research's fall-back argument is that even if the plaintiffs have established statutory jurisdiction under General Statutes § 33-929 (f), the record does not support a finding that it has sufficient "minimum contacts" with Connecticut to satisfy due process standards. For the reasons that follow, the Court finds that such minimum contacts have indeed been established, and thus that the defendant's instant motions must be denied.
"A state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist "minimum contacts' between the defendant and the forum state." World-WideCT Page 11083Volkswagen Corp. v. Woodson, 444 U.S. 286, 291, 100 S.Ct. 559,62 L.Ed.2d 490 (1980). The contacts must be such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice" International Shoe Co. v. Washington,326 U.S. 310, 326, 66 SCt. 154, 90 L.Ed.2d 95 (1945).
"The twin touchstones of due process analysis under the minimum contacts doctrine are foreseeability and fairness."United States Trust Co. v. Bohart, 197 Conn. 34. 41,495 A.2d 1034 (1985). "The specific facts of each case necessarily determine the outcome of a minimum contacts analysis." Id. at 42.
"It is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King Corp. v.Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528
(1985). However, "jurisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State. . . . So long as a commercial actor's efforts are "purposefully directed' toward residents of another State, [our Supreme Court has] . . . consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." Id. at 476.
"Either "specific' jurisdiction or "general' jurisdiction can satisfy the constitutional requirement of sufficient minimum contacts between the defendant and the forum" Thomason v.Chemical Bank, supra, 234 Conn. at 288. A State can exercise "specific jurisdiction" over a defendant when the suit in question arises out of or relates to the defendant's contacts with the forum. Helicopteros Nacionales de Columbia. S.A. v.Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). A State can exercise "general jurisdiction" over a defendant when, though the suit in question does not arise out of or relate to the defendant's contacts with the forum, such contacts are "continuous and systematic." Id. at 414, 416.
The plaintiffs claim that this Court can exercise specific jurisdiction over the defendant because this case arises out of plaintiff David Goldstein's use or consumption of goods which the defendant manufactured and distributed with the reasonable expectation that they would be marketed throughout the United States, and thus that they would reach and be used or consumed in the State of Connecticut. The question here presented is thus CT Page 11084 whether, by engaging in that activity, the defendant so ""purposefully directed' [its commercial efforts] toward residents of [this] State," Burger King Corp. v. Rudzewicz,supra, 471 U.S. at 476, as to subject itself to the jurisdiction of this Court.
Prior to 1987, the United States District Court for the District of Connecticut observed that, "After World-WideVolkswagen[, supra], the courts which have sustained jurisdiction on the basis of a defendant's expectation that its goods would enter the forum state have done so in cases involving specific evidence that the defendant knew or should have known that its goods would be entering the forum jurisdiction." Shaw v. AmericanCyanamid Co., 534 F. Sup. 527, 531 (D. Conn. 1982). In 1987, however, in the case of Asahi Metal Industry Co. v. SuperiorCourt, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), a plurality of the United States Supreme Court rejected that analysis as follows in an opinion by Justice O'Connor which the courts of several federal circuits, including the Second Circuit, have since accepted as a binding statement of federal constitutional law[5]: "[T]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum Stat. . . . [A] defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." Id. at 112. Here, claims the defendant, the only possible basis for asserting personal jurisdiction over it is its asserted awareness, while manufacturing and distributing the product here at issue, that that product would be placed into the national stream of commerce, and by that route be swept into Connecticut. Claiming that it has no other contacts with the State of Connecticut, the defendant asserts that such acts and awareness, without more, are inadequate to establish jurisdiction under Asahi.
The procedural posture of Asahi is remarkably similar to that of this case. There, when the American victim of a California motorcycle accident brought suit in a California state court against Cheng Shin, the Taiwanese manufacturer of the motorcycle's allegedly defective tire, Chen Shin brought an indemnification claim against Asahi as the alleged suppher of the part that caused the tire to fail. Cheng Shin had manufactured the tire in Taiwan using a tire valve assembly made by Asahi in Japan. Though Asahi was aware that Cheng Shin tires incorporating CT Page 11085 its assemblies would be sold in California, the Supreme Court held that it had not, by selling those assemblies to Cheng Shin with that awareness, purposefully directed its activities toward the State of California.
In reaching that conclusion, Justice O'Connor searched the record in vain for other indications that Asahi had so directed its commercial activities toward California as to bring itself constitutionally within the jurisdiction of California's courts. On this score, she sought to determine if, for example, there was evidence that Asahi had done business in the State of California, that it had an office, agents, employees or property in California, that it had designed its assemblies to serve the particular market in California, that it had advertised its products in California, that it had established channels for providing regular advice to its customers in California, that it had marketed its products through a distributor who had agreed to serve as its sales agent in California, and/or that it had created, controlled or employed the distribution system that brought the allegedly defective product into California. Id. Satisfying itself that no such additional contacts had been established, the plurality ruled that Asahi had insufficient contacts with California to warrant subjecting it to the jurisdiction of a California court.
In this case, as in Asahi the defendant is an out-of-state corporation that has never been incorporated or licensed to do business in this state. In support of its motions to dismiss, it has presented evidence in the form of a sworn affidavit from its President, Cliff Boyci, who averred that as of August 19, 1996, Forage Research had never owned any property in Connecticut, had never had any agents or employees here, had never maintained any office, telephone listing, mailing address or bank account here, had never been a party to any contract entered into or to be performed here, had never sold any product or derived revenue from the sale of any product here, and had never done or solicited any business here of any kind. See generally Boyer Affidavit (8/19/96) (attached to Forage Research's September 3, 1996 Memorandum in Support of Motion to Dismiss as Exhibit A). The defendant also claims that it, like its Japanese counterpart in Asahi, played no role in establishing, directing or controlling the distribution system that brought its products into this state. It therefore claims that since none of its commercial activities were purposefully directed to the citizens of this state, it is constitutionally entitled to the dismissal CT Page 11086 of all claims against it under federal due process standards.
Here, however, the record shows that this defendant has done far more to purposefully avail itself of the privilege of conducting activities in this state than the defendant in Asahi
did in California. First, despite the defendant's protestations to the contrary, convincing evidence has been presented that it has repeatedly solicited business in Connecticut for many years.See generally Part II.A of this Memorandum of Decision, supra at 5-12. Second, the evidence clearly establishes that instead of merely setting its goods adrift in the stream of commerce, aware of but indifferent as to their ultimate destination, this defendant has played an active role in attempting to develop a nationwide market for its products, most particularly for its human grade microbial product, ProBiotic Supplement, that allegedly injured David Goldstein. See generally Part II.B of this Memorandum of Decision, supra at 12-18. It pursued a nationwide market for ProBiotic Supplement by selecting Nutrition Now as the company to market it. It determined that that product should be marketed throughout the United States, and so indicated in its original offer of exclusive marketing rights to Nutrition Now. It determined that to justify its granting of exclusive nationwide marketing rights for ProBiotic Supplement, a guaranteed minimum quantity of the product would have to be sold each year of the agreement. Finally, it reserved for itself the right to terminate the exclusive nationwide marketing rights of Nutrition Now if the minimum purchasing requirements of the contract were not met. In sum, Forage Research sought to establish itself as a player in the national market for human grade microbial products, and played an active role in pursuing that goal by setting sales targets for its product and recruiting a company with nationwide marketing resources to help it reach them. In light of that activity, and of its longtime advertising activity in the State of Cormecticut, the Court concludes that the defendant has sufficient minimum contacts with Connecticut to give it fair notice that it might be haled into court here, and thus to satisfy the foresceability prong of the federal due process test for the exercise of personal jurisdiction over a foreign corporation.
To overcome a due process challenge to the Court's jurisdiction over a foreign corporation, however, a plaintiff must also satisfy the fairness prong of the federal due process test. As Judge Cabranes, writing for the Second Circuit inMetropolitan Life Ins. v. Robertson-Ceco Corp. , 84 F.3d 560, 568
CT Page 11087 (2d Cir. 1996), has explained,
 The second stage of the due process inquiry asks whether the assertion of personal jurisdiction comports with "traditional notions of fair play and substantial justice" — that is, whether it is reasonable under the circumstances of the particular case. See International Shoe [supra,] 326 U.S. at 316. The Supreme Court has held that the court must evaluate the following factors as part of this "reasonableness" analysis: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiffs interest in obtaining convement and effective relief; (4) the interstate judicial system's interest in obtaining convement and effective relief, and (5) the shared interest of the states in furthering substantive social policies. Asahi, [supra,] 480 U.S. at 113-14; see also Burger King, [supra,] 471 U.S. at 476-77; World-Wide Volkswagen Corp. v. Woodson, [supra,] 444 U.S. 286, 292 (1980); A.I. Trade Fin., Inc. v. Petra Bank, 989 F.2d 76, 83, 2d Cir. 1993) (discussing factors). While the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry, it may be defeated where the defendant presents "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King, [supra,] 471 U.S. at 477.
Applying the above-listed factors to the evidence presented on this motion, the Court cannot find that the defendant has presented a compelling case as to the presence of other considerations that would Tender the exercise of jurisdiction unreasonable, notwithstanding the existence of sufficient minimum contacts to satisfy the foreseeability prong of the due process inquiry. First, as to burden on the defendant, the Court must note, as did the Second Circuit in Metropolitan Life Ins. v.Robertson-Ceco Corp. , supra, 84 F.3d at 573-74, that "there are many difficulties associated with requiring [an out-of-state defendant] to defend this suit" in a distant state. InMetropolitan, where the defendant was a Delaware corporation doing business in Pennsylvania called upon to defend itself in an action in Vermont, the Court held that although "none of [the defendant's] records, files or witnesses with information about the litigation [were] located [in Vermont], . . . the conveniences of modem communication and transportation [so] ease what would have been a serious burden only a few decades CT Page 11088 ago[,] . . . [that] this factor cuts [only] slightly in favor of the defendant . . . [and,] taken alone, . . . falls short of overcoming the plaintiff's threshold showing of minimum contacts." Id. Here, then, where a Missouri defendant doing business in Missouri has been called upon to defend an action in Connecticut, the most that can be said, in the absence of evidence showing special circumstances why mounting a defense here would result in serious hardship, is that this factor cuts slightly in favor of the defendant, but not so much as to overcome the plaintiffs' threshold showing of minimum contacts.
As for the second "fairness" or "reasonableness" factor — the interests of the forum in adjudicating the case — there can be no question that that factor strongly favors the plaintiffs. Here, Connecticut's interest in adjudicating this controversy is substantial indeed, for the controversy involves a Connecticut resident who claims that was injured in Connecticut by using or consuming a product manufactured and distributed with the reasonable expectation that it would be used or consumed here. This is the very sort of strong forum interest, in the absence of which the Second Circuit ruled in Metropolitan that it would be unfair to require the litigation of a controversy in a distant state. Id. at 574.
The third "fairness" or "reasonableness" factor also strongly favors the plaintiffs. That factor — the interests of the plaintiff in obtaining convenient and effective relief — is clearly implicated in this case, for here, to reiterate, the plaintiff is a Connecticut resident who allegedly was injured by a defective product in Connecticut.
As for the fourth of the "fairness" or "reasonableness" factors — the efficient administration of justice — Judge Cabranes observed in Metropolitan that, "In evaluating this factor, courts generally consider where witnesses and evidence are likely to be located." Id. at 574-75. There, since none of the parties was a resident of Vermont and no witnesses or other evidence concerning the case, which involved a Florida automobile accident, could be found in Vermont, the Court found that the factor strongly favored the defendant. Id. Here, by contrast, the plaintiffs and at least one defendant are Connecticut residents, other defendants do business in Connecticut, and many witnesses to the plaintiff's injuries, all allegedly suffered in Connecticut, are doubtless local residents as well. In sum, this factor strongly favors the plaintiffs. CT Page 11089
The fifth and final factor in the Court's "fairness" or "reasonableness" inquiry is considerations of public policy which may bear on the Court's exercise of jurisdiction. This factor requires the Court "to consider the common interests of the several states in promoting substantive social policies."Metropolitan, supra, 84 F.3d at 575. Here, as in Metropolitan, no such factors have been argued or suggest themselves. Therefore, this factor favors neither party.
In conclusion, this Court believes that the plaintiffs have satisfied both prongs of the due process inquiry required of it by Fourteenth Amendment of the United States Constitution. Accordingly, the defendant's motions to dismiss must be denied.
It is so ordered this 11th day of August, 1999.
Michael R. Sheldon, J.